**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 18-7300

ALFONZA HARDY GREENHILL,

Plaintiff - Appellant,

v.

HAROLD W. CLARKE, Director of the State of Virginia Department of Corrections; A. DAVID ROBINSON, Chief of Corrections Operations of the State of Virginia Department of Corrections; EARL BARKSDALE, Warden of Red Onion State Prison,

Defendants - Appellees.

-----------------------------------------------

DAN PACHOLKE, former corrections official; JEANNE WOODFORD, former corrections official; PHIL STANLEY, former corrections official; DICK MORGAN, former corrections official; ELDON VAIL, former corrections official; PROFESSORS AND PRACTITIONERS OF PSYCHIATRY, PSYCHOLOGY, AND MEDICINE; MUSLIM ADVOCATES; RECONSTRUCTIONIST RABBINCAL ASSOCIATION; INTERFAITH ALLIANCE FOUNDATION,

Amici Supporting Appellant.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. James P. Jones, District Judge. (7:16-cv-00068-JPJ-RSB)

Argued: October 31, 2019                    Decided: December 6, 2019

Before NIEMEYER and AGEE, Circuit Judges, and Thomas S. KLEEH, United States District Judge for the Northern District of West Virginia, sitting by designation.

———————————

Vacated and remanded with instructions by published opinion. Judge Niemeyer wrote the opinion, in which Judge Agee and Judge Kleeh joined.

———————————

**ARGUED:** Daniel Mark Greenfield, NORTHWESTERN PRITZKER SCHOOL OF LAW, Chicago, Illinois, for Appellant. Toby Jay Heytens, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. **ON BRIEF:** David M. Shapiro, Roderick and Solange MacArthur Justice Center, NORTHWESTERN PRITZKER SCHOOL OF LAW, Chicago, Illinois, for Appellant. Mark R. Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Laura H. Cahill, Assistant Attorney Counsel, Matthew R. McGuire, Principal Deputy Solicitor General, Michelle S. Kallen, Deputy Solicitor General, Brittany M. Jones, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee. Elizabeth Hagerty, Claudia Pare, Washington, D.C., Allen P. Pegg, HOGAN LOVELLS US LLP, Miami, Florida, for Amici Former Corrections Officials Dan Pacholke, Jeanne Woodford, Phil Stanley, Dick Morgan, and Eldon Vail. Michael P. Doss, SIDLEY AUSTIN LLP, Chicago, Illinois, for Amici Professors and Practitioners of Psychiatry, Psychology, and Medicine. Johnathan J. Smith, Sirine Shebaya, Matthew W. Callahan, MUSLIM ADVOCATES, Washington, D.C., for Amici Muslim Advocates, The Reconstructionist Rabbinical Association, and Interfaith Alliance Foundation.

———————————

NIEMEYER, Circuit Judge:

Proceeding *pro se*, Alfonza Greenhill, an inmate at Red Onion State Prison in Pound, Virginia, commenced this action against officials of the Virginia Department of Corrections (the "VDOC") under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and the Free Exercise Clause of the First Amendment, alleging that the VDOC was denying him the ability to practice central tenets of his Muslim religion. Specifically, he alleged that the VDOC had denied his request to participate, directly or by television, in a Friday prayer service known as Jum'ah and interfered with his ability to maintain a beard of approximately four inches in length. The VDOC justified its actions with respect to Jum'ah services by noting that Greenhill is committed to restrictive housing because of an extensive record of disciplinary infractions, and therefore, as a matter of policy, he is denied the "privilege" of television access. It also acknowledged that Greenhill has been unwilling to participate in its "Step-Down Program," which is designed to encourage him to earn a reduction in restrictions and through which he could earn access to a television, allowing him to participate in Jum'ah every Friday through the prison's closed-circuit broadcast. With respect to the length of Greenhill's beard, the VDOC defended its grooming policy as necessary to promote safety, security, and sanitation. Recently, however, it adopted a new grooming policy that supplants the policy Greenhill challenged in the district court.

The district court accepted the VDOC's justification for denying Greenhill television access and found that its then-existing grooming policy did not substantially

3

burden Greenhill's religious exercise. Accordingly, it granted summary judgment to the VDOC.

Because we find the VDOC's stated justifications for denying Greenhill access to Jum'ah and interfering with his ability to maintain a four-inch beard invalid under both RLUIPA and the First Amendment, we vacate the district court's judgment and remand for further proceedings.

I

Greenhill is serving a 15-year sentence for committing various crimes, including assault, robbery, and the illegal use of a firearm, and he is currently incarcerated at Red Onion State Prison. Because of numerous and ongoing disciplinary violations, Greenhill has been classified as a Security Level S inmate — a classification given to inmates with a "pattern of excessive violent disciplinary charges reflecting inability to adjust to a lower level of supervision." Accordingly, he is segregated from the general prison population. The VDOC operates a "Step-Down Program," which incentivizes inmates to transition to less restrictive security levels by offering increasingly greater privileges for good behavior, but Greenhill has refused to participate in the Program. As a result of his refusal, as well as additional disciplinary issues, Greenhill has been assigned to Special Management-Zero ("SM-0") status, which, as the Program's most restrictive level, relegates inmates to what amounts to solitary confinement and imposes the greatest limitations on their activities.

As an SM-0 inmate, Greenhill is confined alone to a small cell with limited daily exercise time and restricted contacts with others. Under VDOC policies, he is not eligible

4

to hold a job, participate in group activities, or keep a personal television in his cell. To advance to less restrictive levels under the Step-Down Program, Greenhill would have to "(i) [e]liminate disciplinary infractions[;] (ii) [m]eet a set of responsible behavior goals[; and] (iii) [p]articipate in self-improvement and education programs." At each level of the Step-Down Program, he would be awarded increasingly greater privileges.

Greenhill is an observant Muslim and asserts that he "practices Islam in its Sufi context . . . that emphasizes a strict adherence" to the ways of Islam. He maintains that Islam "obligates him to be present, bodily or visually, at the weekly Islamic gathering known as Jum'ah." "Jum'ah," he explains, "is a central tenet of Islam," and his absence from Jum'ah causes him to "incur[] a terrible sin." Although he would prefer to attend in-person services, Greenhill concedes that watching video broadcasts of Jum'ah would satisfy the requirements of his religious belief. Greenhill also states that Islam "obligates him to grow his beard to, and maintain it at, the length of his fist," which is approximately "four inches in length."

Before commencing this action, Greenhill complained to prison officials that, even though the VDOC offered Jum'ah to prisoners in person or through closed-circuit broadcasts, it wrongfully denied him any participation, relying on its policy that group activities and television access are privileges not made available to SM-0 inmates. He also complained that the VDOC's grooming policy, which penalized long beards, likewise failed to account for his religious beliefs.

Red Onion does indeed broadcast Jum'ah weekly on closed-circuit television, and the VDOC has conceded that it could physically provide Greenhill with television access

5

for viewing Jum'ah. It has maintained, however, that it should not be required to allow such an accommodation, "considering Greenhill's security and housing classification." Responding to Greenhill's request for limited access to a television to participate in the weekly, one-hour Jum'ah service, the VDOC stated that Greenhill would be able to purchase a television to view Jum'ah services if "he could progress [under the Step-Down Program]." As the VDOC explained, "personal televisions are considered a privilege and may be purchased from the commissary. If Greenhill continues to participate in the Step-Down Program by working to reach established goals and remain infraction free, [he] can be considered for a pod job that would enable him to earn money for a personal television." Greenhill, however, has "continue[d] to receive disciplinary convictions and refuse[d] to participate in the Step-Down Program." The VDOC asserted that "removing the escalating privilege levels [for inmates such as Greenhill] would render the entire incentive-based Step-Down Program ineffective." Therefore, it adhered to its position that enforcing the Step-Down Program justified denying Greenhill, while classified as an SM-0 inmate, access to a television for Jum'ah.

As to its grooming policy, the VDOC has maintained that the uniform standards it sets forth are necessary to "facilitate the identification of offenders and promote safety, security and sanitation." While the VDOC has reissued and amended its grooming policy several times since Greenhill filed his initial grievance with prison officials, Greenhill has specifically challenged the 2013 and 2016 versions of the policy and their various amendments. In these versions, the policy has prohibited inmates from maintaining beards beyond a specified length — one-quarter inch in the 2013 version of the policy and one-

6

half inch in the 2016 version. The 2013 and 2016 versions have also required separate identification photos showing inmates with and without facial hair; imposed penalties for noncompliance with policy guidelines; and mandated that noncompliant inmates would remain in some form of segregated housing until they complied with the grooming standards.

Since briefing in this case, the VDOC has informed the court that, as of June 2019, it no longer has an across-the-board policy prohibiting beards beyond a specified length. Rather, an inmate can grow his beard to any length unless he has been convicted of concealing contraband in a long beard, has previously altered a long beard in an attempt to disguise his identity, or wears a beard that promotes gang identification or creates a health hazard.

After Greenhill filed his complaint in this action, the VDOC filed two motions for summary judgment. It argued that neither the provisions of its Step-Down Program that deny Greenhill a television nor its grooming policy substantially burdened Greenhill's religious practice. And even if the policies imposed a substantial burden, the VDOC argued, they were both the least restrictive means of furthering a compelling government interest under RLUIPA and reasonably related to legitimate penological interests under the First Amendment test laid out in *Turner v. Safley*, 482 U.S. 78 (1987). Discussing the policies of its Step-Down Program in particular, the VDOC asserted that it

> has a compelling interest in the success of the Step-Down Program in order to maintain order, reduce disruptive/dangerous behaviors, and promote successful re-entry of inmates post-incarceration, and the current restrictions on SM offender[] privilege[] levels are the least restrictive

7

means of furthering that interest. Removing the escalating privilege levels would render the entire incentive-based Step-Down Program ineffective.

Ultimately, the district court granted the VDOC's motions as to both Greenhill's RLUIPA and First Amendment claims, entering summary judgment in its favor. The court determined that, under RLUIPA, any burden imposed by the Step-Down Program policies limiting television access was permissible because (1) the "VDOC ha[d] a compelling interest in rehabilitating its prisoners," both for internal security and to prepare them for life outside prison, and (2) the VDOC's television ban "further[ed] compelling penological interests by the least restrictive means." And the court found, with respect to the grooming policy, that Greenhill had not "met his threshold showing that [the policy] [was] placing a substantial burden on his religious practice to wear a four-inch beard." As to the First Amendment claims, the court found that, under the *Turner* test, both sets of policies were reasonably related to legitimate penological interests.

From the district court's partial summary judgment dated December 15, 2017, and its final judgment dated September 19, 2018, Greenhill filed this appeal. On appeal, he is represented by counsel.

II

Jum'ah is a gathering of Muslims for group prayer beginning after the sun reaches its zenith on Fridays, and it constitutes one of the central practices of Islam. *See O'Lone v. Estate of Shabazz*, 482 U.S. 342, 345 (1987) (describing Jum'ah as "a weekly Muslim congregational service" that is "commanded by the Koran and must be held every Friday after the sun reaches its zenith"). Greenhill contends that he must participate in this service

8

bodily *or visually* with at least three other Muslims.  He asserts that, because he remains in solitary confinement, the VDOC is denying him such participation even though it could readily be provided by giving him access to a television during the Jum'ah service, which is broadcast within the prison by closed-circuit television.  He maintains that VDOC's denial of access to a television for this limited purpose imposes a substantial burden on his religious exercise.

Greenhill identified three ways by which he could view Jum'ah services.  *First*, the VDOC could install a communal television in the pod in which his cell is located, allowing him to watch the service from his cell; *second*, the VDOC could allow him to watch the service on a television while secured in one of the classroom cages contained in his pod; or *third*, the VDOC could place a television in his cell "every Friday, at the time of Jum'ah, and then remove that television, once the Jum'ah video is over."

The VDOC does not dispute the sincerity of Greenhill's religious beliefs.  Nor does it contend that it could not physically provide Greenhill access to a television by which he could view Jum'ah services.  Rather, it argues that denying Greenhill access to a television is integral to its "compelling interest in the success of its Step-Down Program."  It explains that, as a matter of policy, it purposefully denies television access to SM-0 inmates, like Greenhill, in order to encourage them to participate in the Step-Down Program and thereby progress to less restrictive levels, where television access is provided.  The VDOC argues that to provide Greenhill access to a television while he is an SM-0 inmate would "dilute[] the incentive for offenders to progress through the [Program]," emphasizing that it "classifies television access as 'a privilege' rather than a right [. . .] and something that

9

SM-0 offenders may earn." It notes that if Greenhill participated in and progressed to the next level of the Step-Down Program, he would be permitted to work, save his earnings to purchase a personal television from the commissary, and keep the television in his cell to watch Jum'ah services, as well as other programming.

The district court essentially adopted the VDOC's position, holding that "although the television restriction for SM-0 inmates may substantially burden Greenhill's Jum'ah practice, that restriction furthers compelling penological interests by the least restrictive means." The court explained that "the VDOC has a compelling interest in rehabilitating its prisoners — to further internal safety and security, but particularly to prepare an inmate like Greenhill, who is nearing the end of his prison term, for life outside segregated confinement." It agreed with the VDOC that "since television access is one of the best motivations for inmates to work toward advancement in the Step-Down Program, [the VDOC's] restrictions, including the television ban in SM-0, 'are the least restrictive means of furthering' the state's compelling interest in the Step-Down Program's success in maintaining order, reducing inmates' disruptive and dangerous actions, and promoting successful re-entry to society." Finally, the court noted that "Greenhill does not offer evidence in contradiction of the defendants' contention that the television ban is the least restrictive means of furthering the state's compelling interest in motivating him to make positive changes in his thinking and conduct."

The issue thus presented is whether television access limited to religious exercise can be denied solely because television access is considered a privilege important to the VDOC's Step-Down Program and must be earned by good behavior.

10

Section 3 of RLUIPA provides:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person —

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a). The term "government" is defined to include state officials, *see id.* § 2000cc–5(4)(A), and "religious exercise" is defined as "any exercise of religion, whether or not compelled by, or central to, a system of religious belief," *id.* § 2000cc–5(7)(A). And Congress has expressly mandated that RLUIPA be construed "in favor of a broad protection of religious exercise." *Id.* § 2000cc–3(g).

Under RLUIPA, the inmate bears the initial burden of establishing that a prison policy substantially burdens his or her ability to practice in accordance with a sincerely held religious belief. *See Incumaa v. Stirling*, 791 F.3d 517, 525 (4th Cir. 2015). While RLUIPA does not define "substantial burden," we have held that the term has the same meaning as it does in the First Amendment context. *See Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006). And in that context, "a substantial burden is one that puts substantial pressure on an adherent to modify his behavior and to violate his beliefs or one that forces a person to choose between following the precepts of her religion and forfeiting governmental benefits, on the one hand, and abandoning the precepts of her religion on the other hand." *Id.* (cleaned up).

11

Once the inmate makes the requisite initial showing, the burden shifts to the government to show that the prison policy is the least restrictive means of furthering a compelling governmental interest. *See* 42 U.S.C. § 2000cc–1(a); *Lovelace*, 472 F.3d at 189. This is a strict scrutiny standard, requiring "the government to show that it lacks other means of achieving its desired goal without imposing a substantial burden on the exercise of religion by the objecting party." *Holt v. Hobbs*, 135 S. Ct. 853, 864 (2015) (cleaned up); *see also Couch v. Jabe*, 679 F.3d 197, 203 (4th Cir. 2012). While this is an "exceptionally demanding" standard, *Holt*, 135 S. Ct. at 864, Congress nonetheless anticipated that courts would apply it with "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with consideration of costs and limited resources," *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citing 146 Cong. Rec. 16698, 16699 (2000) (joint statement of Sen. Hatch and Sen. Kennedy on RLUIPA)).

The VDOC's Step-Down Program appears to be a sophisticated, well-conceived program to better inmates' behavior and their confinement, as well as to improve safety and the overall operation of the prison. But holding inmates' religious exercise hostage to incentivize their participation in the Program is impermissible under RLUIPA. Access to bona fide religious exercise is not a privilege to be dangled as an incentive to improve inmate conduct, and placing such religious exercise in the category of *privilege* to be earned is fundamentally inconsistent with the *right* to religious exercise that RLUIPA guarantees to prisoners. To be valid, a justification for burdening this particular religious exercise must address specifically why the denial of limited television access to participate in

12

Jum'ah services is necessary "to maintain good order, security, and discipline or to control costs." *Lovelace*, 472 F.3d at 190. While television access in general may well be used as a carrot to encourage inmate improvement and overall safety, access to religious exercise is a right and may not be so used. Nor does it "make[] [any] difference to [the RLUIPA] analysis that the burden on [an inmate's] religious exercise resulted from discipline, . . . rather than from a prison's failure to accommodate his religious needs in the first instance." *Id.* at 188. In short, the VDOC's well-intentioned policy categorizing television access as a privilege only available in certain phases in the Step-Down Program cannot likewise extend to categorizing Greenhill's statutorily protected religious exercise as "a privilege." This would be inconsistent with both RLUIPA's text and Congressional intent, as RLUIPA makes clear that inmates' *religious exercise is not a privilege, but a right*.

Moreover, the Step-Down Program's policies serve as a blanket prohibition on all SM-0 inmates from accessing television, whether for entertainment or religious exercise, which is not the least restrictive means of furthering a compelling government interest. In this case, Greenhill has suggested much less restrictive alternatives that stop short of unfettered personal television access, such as (1) viewing Jum'ah services from a communal television placed in the television-ready pod where he is incarcerated; (2) being escorted from his cell to a pod classroom, where he could view only Jum'ah services on a television brought in for that purpose; or (3) receiving in-cell access to a television once per week solely for the duration of the Jum'ah broadcast. But the VDOC has offered no explanation as to why providing Greenhill access to Jum'ah services one hour each week through one of these means would undermine its institutional needs. *See Lovelace*,

13

472 F.3d at 190 (identifying good order, security, discipline, and a control of costs as legitimate institutional needs).

While the VDOC need not conceive of and then reject every possible alternative, it does need to demonstrate that it considered and rejected those alternatives set forth by Greenhill both prior to litigation as part of the prison grievance process and through the course of litigation in the district court. *See Holt*, 135 S. Ct. at 868 (Ginsburg, J., concurring) ("[N]othing in the Court's opinion suggests that prison officials must refute every conceivable option to satisfy RLUIPA's least restrictive means requirement. Nor does it intimate that officials must prove that they considered less restrictive alternatives at a particular point in time. Instead, the Court correctly notes that the Department inadequately responded to the less restrictive policies that [P]etitioner brought to the Department's attention during the course of the litigation, including the more permissive policies used by the prisons in New York and California); *see also United States v. Christie*, 825 F.3d 1048, 1061 (9th Cir. 2016) (reasoning in an analogous context that "[a]t a minimum, the government must address those alternatives of which it has become aware during the course of [the] litigation"). Rather than following this procedure, the VDOC has simply undertaken to justify generally the merits of its Step-Down Program — a misdirected effort, given that Greenhill does not challenge the Program as a whole, and one that fails to explain why Greenhill cannot be provided access to a television specifically for Jum'ah services.

Because the VDOC's motion for summary judgment and the district court's opinion granting it rested on the merits of the incentives in the VDOC's Step-Down Program to

14

justify denying Greenhill television access, without recognizing Greenhill's *right* to religious exercise, we vacate the judgment. We remand for further proceedings to allow the VDOC an opportunity to demonstrate any other reasons, as it now claims it has, to justify the denial of television access for Jum'ah services that are "in furtherance of a compelling government interest" and are "the least restrictive means of furthering that compelling government interest." 42 U.S.C. § 2000cc-1(a).

### III

Greenhill also contends that the VDOC's grooming policy limiting inmates' beards to a specified length — *i.e.*, one-quarter inch in the 2013 version of the policy and one-half inch in the 2016 version — burdened his religious practice of maintaining a beard the length of his fist. Under that policy, "[a]ll offenders who refuse to comply with . . . grooming standards will remain in segregation status until the offender is in compliance with the grooming standards" or is accepted for transfer to a unit designated for the improvement of inmates' grooming. Greenhill states that irrespective of the reasons for his solitary confinement, the grooming policy prevents him from returning to the general prison population so long as he maintains his beard, putting him to the choice between staying in restrictive housing or violating his faith by shaving his beard. This, he maintains, is the very definition of a substantial burden prohibited by RLUIPA.

The district court concluded that Greenhill had failed to establish that the grooming policy substantially burdened his religious exercise, explaining that Greenhill was in segregated confinement due to his own poor choices, not his religious practices. The court

15

also noted that Greenhill's non-compliance with the grooming policy would not prevent his advancement to less restrictive levels of the Step-Down Program.

We conclude that the VDOC's grooming policy also imposed a substantial burden on Greenhill's religious exercise under RLUIPA. As we have acknowledged, "removing privileges in [an] effort to compel compliance, despite not physically forcing [an] inmate to cut his hair, qualifies as [a] substantial burden." *Couch*, 679 F.3d at 200–01 (citing *Warsoldier v. Woodford*, 418 F.3d 989, 995–96 (9th Cir. 2005)). In *Couch*, we held that a prior VDOC policy imposed a substantial burden where inmates' non-compliance with grooming standards caused them to "have certain privileges restricted for a short term[,]" including "access to personal property, movement rights, the right to eat and associate with others, recreation time, and visitation time." *Id.* at 199. Similarly, under the versions of VDOC's grooming policy that Greenhill challenges, his non-compliance with the policy forecloses the privilege of returning to a general population environment. We thus conclude that Greenhill met his initial showing under RLUIPA that the VDOC grooming policies he challenged substantially burdened his religious practice of maintaining a four-inch beard. Moreover, the VDOC's adoption of yet another version of its grooming policy since this appeal was briefed suggests that a less restrictive means was available to accommodate Greenhill's religious exercise.

Therefore, we also vacate the district court's judgment with respect to the grooming policy and remand to complete the RLUIPA analysis and determine whether the versions of the grooming policy challenged by Greenhill reflect the least restrictive means to achieve a compelling government interest.

16

## IV

Greenhill also challenges the VDOC policies under the Free Exercise Clause of the First Amendment, which — through the Fourteenth Amendment — prohibits a State from making any law "prohibiting the free exercise [of religion]." U.S. Const. amend. I; *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000). The Free Exercise Clause requires prison officials to reasonably accommodate an inmate's exercise of sincerely held religious beliefs. *See O'Lone*, 482 U.S. at 349–50. "In order to state a claim for violation of rights secured by the Free Exercise Clause, an inmate, as a threshold matter, must demonstrate that: (1) he holds a sincere religious belief; and (2) a prison practice or policy places a substantial burden on his ability to practice his religion." *Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018). But even a regulation that substantially burdens a practice of sincerely held religious beliefs "is valid if it is *reasonably related* to legitimate penological interests." *Turner*, 482 U.S. at 89 (emphasis added). This analysis requires deference to prison officials in an examination of (1) whether there is "a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) whether there are "ready alternatives." *Id.* at 89–91 (cleaned up). Thus, the First Amendment does not provide as great a protection for inmates' religious exercise as does RLUIPA. *See Holt*, 135 S. Ct. at 860.

17

The district court applied the *Turner* test and concluded that the VDOC's policies preventing Greenhill from accessing Jum'ah and penalizing his efforts to maintain a four-inch beard were reasonably related to legitimate government interests. We conclude, however, that for essentially the same reasons discussed in connection with Greenhill's RLUIPA claims, the VDOC's treatment of televised access to religious services as merely a privilege to be earned also fails to account for Greenhill's rights under the Free Exercise Clause. The *Turner* factors are used to determine whether a "prison regulation [that] impinges on inmates' constitutional *rights*" may nevertheless be "valid [because] it is reasonably related to legitimate penological interests." 482 U.S. at 89 (emphasis added). But the correct application of the *Turner* test begins with the basic premise that there is a right being impinged. Here, however, the VDOC's justification for preventing Greenhill from viewing Jum'ah was essentially that access to religious services was a privilege for SM-0 inmates to earn. The district court's *Turner* analysis, having adopted the VDOC's justification for its actions, was divorced from the test's central premise and thus erroneous.

As to the grooming policy, the VDOC's 2019 version, which imposes fewer requirements and penalties, suggests that the 2013 and 2016 versions challenged by Greenhill may not have been reasonably related to legitimate penological interests. Moreover, as discussed above, the district court's holding that those versions of the grooming policy did not substantially burden Greenhill's religious practice was error. Given this defect in the district court's First Amendment analysis and the implications of the new grooming policy, the district court should have the opportunity to conduct a new, full First Amendment analysis of Greenhill's grooming-related claim in the first instance.

18

Accordingly, we also vacate the district court's judgment on both of Greenhill's First Amendment claims and remand for further proceedings consistent with this opinion.

V

Consistent with the admirable goals underlying the Step-Down Program, the VDOC might find that providing robust support for inmates' genuine religious exercise would actually enhance prison security and inmate rehabilitation. Indeed, a group of former corrections officials, appearing as amici curiae, have stated that, in their collective experience:

> Reasonably accommodating individual religious practice can have a demonstrably *positive* effect on prisoner adjustment and rehabilitation and, as a result, on the prison security environment as a whole. In contrast, restrictions that unreasonably impede individual religious practice under the banner of prison security and rehabilitation are likely to have the opposite effect.

The amici support their conclusion with numerous studies, articles, and a survey of prison chaplains. Indeed, they demonstrate that the positive effect of religious accommodation was "a motivating factor" in Congress's enactment of RLUIPA.

While our judgment rests on established jurisprudence, we commend for consideration by the VDOC in further proceedings the full practical effect of these observations made by former corrections officials.

VACATED AND REMANDED