**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-7634**

BRAD FAVER,

Plaintiff - Appellant,

v.

HAROLD CLARKE, Director of VDOC,

Defendant - Appellee.

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.  Joel Christopher Hoppe, Magistrate Judge.  (7:16-cv-00287-JCH)

Argued:  October 27, 2021                           Decided:  February 1, 2022

Before WILKINSON, NIEMEYER, and MOTZ, Circuit Judges.

Affirmed by published opinion.  Judge Niemeyer wrote the opinion, in which Judge Wilkinson joined.  Judge Motz wrote a dissenting opinion.

**ARGUED:**  Dallas S. LePierre, HDR LLC, Atlanta, Georgia, for Appellant.  Laura Haeberle Cahill, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.  **ON BRIEF:**  Mario B. Williams, HDR LLC, Atlanta, Georgia, for Appellant.  Mark R. Herring, Attorney General, Victoria N. Pearson, Deputy Attorney General, Toby J. Heytens, Solicitor General, Michelle S. Kallen, Deputy Solicitor General, Martine E. Cicconi, Deputy Solicitor General, Jessica Merry Samuels, Assistant Solicitor General, Zachary R. Glubiak, John Marshall Fellow, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellee.

NIEMEYER, Circuit Judge:

Brad Faver, an inmate in the custody of the Virginia Department of Corrections and a practicing Muslim, commenced this action against the Department's Director (hereafter, "the VDOC"), alleging that the VDOC had denied him the ability to practice tenets of his Muslim religion, in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc *et seq*. Specifically, he alleged that, because of the VDOC's single-vendor policy for its commissaries, he was required to purchase "his perfumed oils [for prayer] from Keefe Commissary [Network, LLC]," which also happens to sell "swine and idols" to other inmates. While he did not allege that the prayer oil sold by Keefe was itself unsuitable, he did allege that "Islam prohibits the acquisition of religious accoutrements *from a company that sells* swine and idols." (Emphasis added). He sought, among other relief, an injunction requiring the VDOC "to allow [him] at least one unobjectionable Muslim oil vendor [from which] to get his oils for prayer."

While the VDOC agreed that, under its single-vendor policy, Faver could purchase prayer oil only from Keefe, it explained that it had adopted the policy for operating its commissaries in 2013 to address substantial issues of security, safety, efficiency, and prison order and that to afford Faver the relief he requests would undermine the policy, thereby diminishing the benefits it provides to the VDOC. The VDOC explained that prior to 2013, when the VDOC had a multiple-vendor policy, it experienced "negative and harmful results" to the security, safety, and efficiency of its facilities. Accordingly, while the VDOC was agreeable to allowing Faver to purchase religious articles, including prayer oil,

2

it would allow him to do so only through Keefe, the single vendor that it had selected to supply and run its commissaries.

Following a bench trial, the district court concluded that the VDOC did not violate Faver's rights under RLUIPA. While it found that Faver had a sincerely held religious belief and that his religious exercise was substantially burdened by the single-vendor policy, it nonetheless concluded that the policy furthered the VDOC's compelling interest of "preventing contraband, which promotes prison safety and security, and reducing the time prison personnel must devote to checking commissary shipments, which controls costs." The court found further that the policy was "the least restrictive means to further its compelling interests."

Because we conclude that the district court did not err in reaching those conclusions, we affirm.

I

Brad Faver, who was, when he filed his complaint, an inmate at Augusta Correctional Center in Craigsville, Virginia, and now is an inmate at the Lawrenceville Correctional Center in Lawrenceville, Virginia, identifies as an observant Muslim, practicing the religion of "Sunni Muslim Orthodox Islam." He asserted that his religion requires, among other things, that he have "prayer oils so [he] can smell good and not distract anybody around [him] in [his] state of prayer." He also maintained that he is not permitted by his religion "to buy any [religious] items[] from any store or vendor that sells idols, swine, or alcohol." He explained that items "that come from a place that sells swine

3

or idols or alcohol" are "tainted in the sight of Allah, [his] higher power." "Idols" include items relating to "Christianity, Judaism, Pagan beliefs, or any other belief besides Islam," and "swine" includes "anything from the pig."

As an inmate of the VDOC, Faver was permitted to purchase items, including religious items and prayer oil in particular, only from Keefe Commissary Network, LLC, except for publications and eyeglasses. The VDOC adopted this single-vendor policy in 2013 in light of experience and for reasons of security, safety, and efficiency. But because, as Faver asserted, Keefe sold idols and swine, Faver could not, consistent with his religion, purchase prayer oil from Keefe. As a consequence, he did not have the benefit of prayer oil as necessary for the practice of his religion. He contended that but for the VDOC's single-vendor policy, he could purchase prayer oil directly from "Halalco," an Islamic vendor that does not sell swine, idols, or alcohol.

The VDOC accepted the sincerity of Faver's religious beliefs but nonetheless required him to purchase prayer oil from Keefe because of its single-vendor policy. It explained that before 2013, when it adopted the single-vendor policy, it allowed multiple vendors to sell items to inmates, which resulted in numerous and substantial issues of prison security, inmate and employee safety, and administrative inefficiency in having to check and test the items purchased from various unknown vendors. Indeed, under the multiple-vendor policy, the VDOC had tested some prayer oil and found it to be "extremely flammable." It also highlighted its past serious problems arising from the smuggling of contraband, which could cause overdoses, and "a potential for assault, potential for fights." For example, it noted that when, in the past, items arrived from multiple vendors, "different

4

items [had been] inserted into other property, like TVs," including drugs, cell phones, and weapons. Similarly, the VDOC also described how packages had been disguised to look as though they had been sent by a seemingly reputable third-party vendor but yet contained contraband. And items in liquid form, such as prayer oil, presented particular difficulties because they had to be tested, as the liquids "could be caustic or poisonous or could be drugs."

The VDOC explained that the multiple-vendor policy had also created a lack of uniformity in inmate property, which contributed to gang affiliation as well as fights over items that were different and more coveted. For example, "when [inmates] could purchase shoes from outside vendors . . . some offenders could purchase some very expensive shoes . . . that everyone wanted to have," resulting in "violence . . . when other inmates wanted to get to those shoes." Nonuniform items were also used as codes to denote gang affiliation.

The VDOC explained further that the multiple-vendor policy raised concerns about health and safety, especially about the "possibility [that] . . . something could enter the facility that could make people ill," particularly if it came "from an unclean environment."

Finally, the multiple-vendor policy required the VDOC, at substantial cost, to commit staff to test all items that entered the prison from multiple sources and to investigate both the vendors themselves and any potential relationships between the vendors and inmates.

As the VDOC "consider[ed] how [it] had been doing things and that wasn't working out" and how it could address the range of problems being experienced with the multiple-vendor policy, it adopted a single-vendor policy in 2013, as stated in its Operating

Procedure 802.1. That procedure requires that all items purchased by inmates, with the exception of publications and eyeglasses, must be acquired through the facility commissary, i.e., Keefe. Under the procedure, this includes "[r]eligious personal property items," such as prayer oil. Op. Proc. 802.1(IV)(B)(10); *see also* Operating Procedure 841.3 (authorizing inmates specifically to purchase prayer oil "through the facility commissary").

To implement the single-vendor policy, the VDOC entered into a comprehensive contract with Keefe that required Keefe to control the provision of items to inmates to make sure "everything [was] in compliance with security, sanitation, and safety [and] that there's consistency of services statewide." The arrangement with Keefe rendered the ordering process "completely blind" so as to preclude Keefe from knowing the identity of the inmate who placed the order. This mechanism, as the VDOC explained, alleviated many concerns from the past when "small vendors[,] maybe connected with a specific inmate[,] [had] things put in boxes and sent in."

The VDOC claims that since it adopted the single-vendor policy, it has not had, as far as it knows, a single incident of contraband entering the prison through the commissary, and it "has reduced the amount of time having to [be] spen[t] going through property coming from virtually anywhere."

Faver commenced this action under RLUIPA in June 2016, seeking, among other things, a declaratory judgment that the single-vendor policy violates RLUIPA and a permanent injunction requiring the VDOC "to allow Faver at least one unobjectionable Muslim oil vendor to get his oils for prayer from."

6

Following a bench trial, the district court held that the VDOC was not violating Faver's rights under RLUIPA. It found as facts that Faver's religious beliefs required that he use prayer oils and that he not purchase them from vendors that sell idols, swine, or alcohol; that the VDOC's single-vendor policy required that inmates purchase such oils from Keefe, whom Faver believes sells idols and swine; and that therefore Faver has not been able to use prayer oils consistent with his stated beliefs. The court also found that the VDOC's experience with the multiple-vendor policy had led to adoption of its single-vendor policy in 2013. The VDOC had, it found, experienced "many security and operational problems from the ordering and delivery of products from [multiple] sources." And in particular, the court found that the VDOC's contractual relationship with Keefe was "especially important as it concerns the delivery of prayer oils because oils are difficult to screen for flammability or hidden contraband."

Based on these findings, the court concluded (1) that the single-vendor policy "substantially burdens" Faver's exercise of his religion; (2) that the single-vendor policy "serves compelling interests in maintaining prison security and efficiency"; and (3) that the policy is "the least restrictive means" to achieve these compelling interests. The court rejected Faver's argument that the VDOC did not consider adding a blanket exception to the policy for religious items, reasoning that such an exception would produce the very problems for the VDOC that the single-vendor policy had sought to avoid. The court also rejected Faver's argument that the VDOC should allow case-by-case exceptions for the purchase of religious items, including entering into a contract with an Islamic vendor like Halalco. It explained that under a policy allowing exceptions for religious items,

7

the VDOC could not rely on a single, systematic approach to screening packages from a single vendor, but would need to scan deliveries arriving from different vendors on different dates, and in different packages. Furthermore, because the VDOC would not necessarily control the terms of the ordering process, it could not ensure anonymity between buyer and seller such that inmates could more easily work with outside vendors to try and smuggle contraband into the facilities. Finally, the VDOC would not have the same guarantees as to the contents of products — such as religious oils — as it does with Keefe and would need to devote additional staff resources for testing and screening products shipped to its facilities. The single-vendor policy . . . has furthered all these goals. *The VDOC has reasonably determined, based on experience, that allowing exceptions would reignite the problems it sought to extinguish.*

(Emphasis added). The court further observed that there was no evidence that there was an Islamic vendor that would be willing to agree to the same stringent requirements of the VDOC's single-vendor contract with Keefe, such as submitting to audits, background checks, and the requirements of Virginia's small business subcontracting plan. The court concluded,

I find the VDOC has considered the use of multiple outside vendors . . . because it permitted exceptions to the single-vendor policy before 2013. That practice proved to undermine the VDOC's compelling interests in safety, security, and cost control, leading to [the] adoption of the single vendor policy. A contract with another outside vendor would again force the VDOC to work with multiple vendors, resurrecting at least some of the problems the VDOC experienced before its single-vendor policy, such as burdensome searches of commissary orders and increased risk of introduction of contraband into the facilities.

From the district court's judgment in favor of the VDOC, dated September 30, 2019, Faver filed this appeal.

8

## II

The VDOC does not dispute that Faver's Muslim religion requires that he use prayer oil while praying and that he obtain the oil from an untainted source, i.e., a vendor who does not sell idols, swine, or alcohol. Its acceptance of his beliefs as to how his religion should be practiced is appropriate. Indeed, the VDOC "has no role in deciding or even suggesting whether [religious beliefs are] legitimate or illegitimate." *Masterpiece Cakeshop, Ltd. v. Colo. Civ. Rts. Comm'n*, 138 S. Ct. 1719, 1731 (2018). Moreover, a government may not impose regulations that are "hostile" to the exercise of religion. *Id*. This — and other fundamental religious rights — are secured by the First Amendment.

But Faver is a convicted felon serving a sentence of imprisonment, and with his confinement, he surrenders constitutional rights to the extent required by the VDOC's "legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Nonetheless, Congress has specifically reaffirmed the First Amendment rights of inmates to the exercise of religion in prison with the enactment of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). That Act provides that no government may "impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person . . . is in furtherance of a compelling governmental interest . . . [and] is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000cc-1(a). The "compelling governmental interest" clause, however, must be read to accord "due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and

9

discipline, consistent with consideration of costs and limited resources." *Cutter v. Wilkinson*, 544 U.S. 709, 723 (2005) (citation omitted); *see also Greenhill v. Clarke*, 944 F.3d 243, 250 (4th Cir. 2019). And in this regard, "RLUIPA [is not meant] to elevate accommodation of religious observances over an institution's need to maintain order and safety." *Cutter*, 544 U.S. at 722; *see also Couch v. Jabe*, 679 F.3d 197, 201 (4th Cir. 2012).

In this appeal, the VDOC does not dispute that its single-vendor policy *substantially burdens* Faver's religious exercise, and Faver does not dispute that the policy furthers a *compelling governmental interest*. *See* 42 U.S.C. § 2000cc-1(a) (requiring the inmate to prove that a policy imposes a "substantial burden" on his religious exercise and the government to prove that the policy furthers a "compelling governmental interest"). The parties disagree, however, on whether the policy is the "least restrictive means" of furthering the compelling governmental interest. *Id.* § 2000cc-1(a)(2). On this issue, the government has the burden of proof. *See Holt v. Hobbs*, 574 U.S. 352, 362 (2015); *Greenhill*, 944 F.3d at 250.

Because "least restrictive means" is a relative term that "implies a comparison with other means," the government must "acknowledge and give some consideration to less restrictive alternatives" to determine whether an alternative "might be *equally as successful* as the Policy in furthering the identified compelling interests," *Couch*, 679 F.3d at 203–04 (emphasis added). But in carrying this burden, the government "need not conceive of and then reject every possible alternative." *Greenhill*, 944 F.3d at 251. Rather, it must "demonstrate that it considered and rejected" the alternatives brought to the government's attention. *Id.* (citing *Holt*, 574 U.S. at 371–72 (Sotomayor, J., concurring)).

10

Faver has brought to the VDOC's attention two alternatives to the single-vendor policy that would allow him to obtain prayer oil that complies with his religious beliefs. First, he has proposed a "centralized exception" that would create an approved list of various religious vendors from which inmates could purchase approved religious items. Second, he has proposed that the VDOC enter into a contract with an Islamic vendor, similar to the contract it entered into with its single commissary vendor Keefe. Both alternatives would require that the VDOC engage at least one additional vendor and thus modify its single-vendor policy. When asked whether the VDOC had considered such alternatives or whether it had "considered [other] methods of providing religious materials to offenders," a VDOC representative stated, "We're always looking to see how we can do things better, but a lot of that involves reviewing history, looking at what problems . . . have been voiced, and balancing that in the name of . . . security and safety *and not going to a place where we were before*." (Emphasis added).

Because both proposed alternatives would, in differing degrees, add vendors, they both would compromise the VDOC's single-vendor policy and necessarily reintroduce — at least to some degree — many of the same problems that had been resolved by that policy. As the court found — a finding that Faver has not challenged as clear error — "[a] contract with another outside vendor would again force the VDOC to work with multiple vendors, resurrecting at least some of the problems the VDOC experienced before its single-vendor policy, such as burdensome searches of commissary orders and increased risk of introduction of contraband into the facilities." And VDOC testimony supports that finding.

11

Its representative stated summarily, after having provided details, that by straying from the single-vendor policy, the VDOC would "regress from a security standpoint."

Logically, adding one Islamic vendor would surely be less problematic than adding a list of vendors. But even adding one vendor would diminish the benefits the VDOC obtained from its policy, rendering even that alternative not "*as successful* as the Policy in furthering the identified compelling interests." *Couch*, 679 F.3d at 204 (emphasis added). With each additional vendor, the VDOC would be adding incrementally to the problems of security, safety, and inefficiency that it had experienced with the multiple-vendor policy. Although it is true that the "classic rejoinder of bureaucrats through history: If I make an exception for you, I'll have to make one for everybody, so no exceptions" is often unpersuasive in RLUIPA contexts, *see Holt*, 574 U.S. at 368 (citation omitted), it is not so here where every additional contract would *directly undermine* the well-reasoned policy of having *only one* vendor.

Moreover, it is far from clear that the VDOC could simply add a *single* Islamic vendor. The VDOC has authorized more than 40 religious groups in its facilities, and members of each of these would be entitled to request an arrangement with another vendor should Faver prevail here. *See Cutter*, 544 U.S. at 724 (noting that RLUIPA should not be read to confer a "privileged status" or authorize "disadvantageous treatment" for "any particular religious sect").

There would also be practical problems in qualifying each vendor. The vendor would have to be willing to fulfill the requirements imposed on Keefe, including background checks, audits, and specialized training. It would also have to be willing to

12

use an ordering process for inmate purchases that would remain blind to the inmate. With each additional vendor, therefore, the VDOC would have to devote more staff time to administering the procurement of items, undermining an efficiency that the single-vendor policy provided.

And with respect to adding a vendor specifically to provide prayer oil, the VDOC would face unique security and safety problems, as the district court found in a well-supported finding. The VDOC explained it would be required to test each container of oil since prayer oil could be flammable, toxic, or even contain contraband drugs. As the VDOC representative testified:

> [W]e don't know where it came from, we don't know the flammability, the viscosity, we don't know what's in it.
>
> When it comes through the single-vendor, we understand what's actually in the oil. We have a contractual fiduciary relationship . . . with Keefe to procure the item that we specify in the correct container [so it] is the actual item that we know it is, that it hasn't been adulterated, that it doesn't contain any — in addition to oils and high flammability it doesn't contain anything else like a poison. We just simply don't know.

In short, the introduction of additional vendors would undermine the core purpose for the single-vendor policy of control, which the VDOC representative explained:

> Single-vendor policy, the purpose has been to control what is coming in and out of our facilities for security reasons. We are required to maintain good security and control of our facilities. Having the items coming in from one place where there is a contractual and fiduciary responsibility to procure items in a trustworthy manner has greatly increased the security of our facilities, and has reduced the amount of time [we] hav[e] to spend going through property coming from virtually anywhere.

And the district court agreed. It found, in a factual finding that Faver has not challenged, that the VDOC's years of experience trying to manage the safety, security, and staffing

13

challenges associated with the multiple-vendor policy "drove the . . . VDOC's adoption of the single-vendor policy." And relying on this factual finding, it held that "the single-vendor policy was the least-restrictive means to further [the VDOC's] compelling interests."

Based on the evidence and the district court's findings, Faver's proposed alternatives are not "*equally as successful* as the [single-vendor] [p]olicy in furthering the identified compelling interests." *Couch*, 679 F.3d at 204 (emphasis added). It follows that the single-vendor policy is the least restrictive means for serving the VDOC's compelling governmental interests.

## III

While RLUIPA deliberately and explicitly provides broad protection of inmates' religious exercise, the Act is nonetheless enforced by balancing inmates' religious interests with a sensitivity to prison's needs "to maintain good order, security and discipline, consistent with consideration of costs and limited resources." *Cutter*, 544 U.S. at 723 (citation omitted). Yet, in many circumstances, a prison's provision of "robust support for inmates' genuine religious exercise would actually enhance prison security and inmate rehabilitation," in furtherance of the prison's needs. *Greenhill*, 944 F.3d at 254. But occasionally, as here, the accommodation of a religious practice will directly undermine the prison's demonstrated compelling interests in security, safety, and efficiency and therefore the practice has to yield. In such a circumstance, the inmate's sentence of

14

imprisonment denies him a measure of religious liberty that would otherwise be protected by the First Amendment.

We are not unsympathetic to Faver's religious requirements, but we also cannot be insensitive to the VDOC's legitimate needs in operating its prison facilities.

The judgment of the district court is accordingly

AFFIRMED.

15

DIANA GRIBBON MOTZ, Circuit Judge, dissenting:

The Government concedes that an inmate, Brad Faver, holds sincere religious beliefs. Faver challenges a prison policy as imposing a substantial burden on those beliefs in violation of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"). Under that statute, the Government bears the burden of showing that a challenged prison policy "is the least restrictive means of furthering [a] compelling governmental interest." 42 U.S.C. § 2000cc-1(a)(2). To satisfy this burden, the Government must "demonstrate that it considered and rejected" less restrictive alternatives proposed by the inmate. *Greenhill v. Clarke*, 944 F.3d 243, 251 (4th Cir. 2019). The Government has failed to do so here. Accordingly, I dissent from the majority's contrary holding.

## I.

RLUIPA prohibits the Government from "impos[ing] a substantial burden on the religious exercise of a person residing in or confined to an institution . . . unless the government demonstrates that imposition of the burden on that person — (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest." § 2000cc-1(a).

Thus, to prevail on a RLUIPA claim, a plaintiff must initially demonstrate that a governmental policy substantially burdens his religious exercise. *Id.* § 2000cc-2(b); *see also Couch v. Jabe*, 679 F.3d 197, 200 (4th Cir. 2012). Here, the district court found that Faver established that his sincere religious exercise requires the use of prayer oils that must be obtained from a vendor that does not also sell pork products or non-Islamic religious items. The Government does not challenge this finding on appeal. And given that the

16

Government has adopted a single-vendor policy requiring its inmates to purchase items through a vendor that does sell pork products and non-Islamic religious items, the Government does not claim on appeal that this policy does not substantially burden Faver's beliefs.

Once a plaintiff has demonstrated that he has a sincerely held religious belief burdened by a government policy, the Government must show that the policy is the least restrictive means of furthering its compelling governmental interest. § 2000cc-2(b); *see also Couch*, 679 F.3d at 200. Faver does not challenge the Government's asserted compelling interest in safety and security, but he does contend that the Government failed to establish that it considered and rejected less restrictive means of furthering that interest.

The least restrictive means test is "exceptionally demanding." *Holt v. Hobbs*, 574 U.S. 352, 364 (2015) (quoting *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014)). To satisfy the test, the Government must "demonstrate that it considered and rejected" all less restrictive alternatives proposed by the plaintiff, regardless of whether the plaintiff proposed them "prior to litigation as part of the prison grievance process [or] through the course of litigation in the district court." *Greenhill*, 944 F.3d at 251. If a less restrictive means exists to achieve the same goals, "the Government must use it." *Holt*, 574 U.S. at 365 (quoting *United States v. Playboy Ent'mt Grp., Inc.*, 529 U.S. 803, 815 (2000)).

## II.

Under the Virginia Department of Corrections' ("VDOC") single-vendor policy, inmates can only purchase items from one vendor — Keefe Commissary — with whom

17

the VDOC has entered into a contract. Before the VDOC formalized that single-vendor policy, it had allowed ad hoc exceptions under which inmates could purchase certain items from vendors other than Keefe. The VDOC representative testified at trial that, when the VDOC allowed those ad hoc exceptions, the VDOC had to search items coming into its prisons "much more" to ensure the prisons' safety and security. The representative explained that eliminating those exceptions provided the VDOC with "greatly increased . . . security of [its] facilities" and "reduced the amount of time [it had] to spend going through property." Faver proposed two less restrictive alternatives that would allow him to purchase his prayer oils from a vendor that does not also sell pork products and non-Islamic religious items but that he contended would still meet the VDOC's security concerns.

First, Faver proposed that the VDOC establish a uniform religious exception under which inmates could purchase religious items from vendors other than Keefe. I agree with the district court that the VDOC has demonstrated that it considered and rejected that proposal. Although the VDOC's history of allowing ad hoc exceptions is not precisely the same as a uniform religious exception, I agree in this case that this is, as the district court concluded, "a distinction without a difference." Based on the VDOC's history of allowing inmates to purchase items from vendors other than its chosen, contractually obligated vendor, the VDOC "could reasonably foresee that [the] problems it [previously] experienced . . . would return."

But Faver's second alternative is a different story. Faver also proposed that the VDOC enter into a *contract* with an Islamic vendor. Unlike Faver's first proposal, under

18

which inmates would be able to purchase items from vendors who had not entered into contracts with the VDOC, his second proposal would permit purchase of prayer oils only from a vendor that had *specifically entered into a contract with the VDOC*.

After the VDOC representative emphasized at trial that it is the contract with Keefe that increased security and safety in the prisons, she conceded that the VDOC had not considered contracting with an Islamic vendor of prayer oils. Despite this testimony, the district court found that the VDOC had adequately considered and rejected the possibility of entering into a contract with an Islamic vendor. The court explained that entering into such a contract would create "at least some of" the same safety and security problems that the VDOC had experienced when it allowed ad hoc exceptions to its current single-vendor policy. In so finding, I believe the court clearly erred.

The VDOC representative testified at trial that "[w]hat gives [the VDOC] the confidence" in the safety and security promoted by its current single-vendor policy "is the *contractual obligations and the fiduciary responsibility*" that a contract with the vendor provides. (emphasis added). The prison representative offered no reason why entering into a contract with an Islamic vendor would fail to provide the VDOC with exactly the same "confidence." Of course, if the VDOC did enter into a contract with an Islamic vendor, the VDOC would receive items from at least one vendor other than Keefe. But the VDOC representative never testified that the mere fact of receiving items from one additional vendor (or even several) would create safety and security issues. Rather, when asked whether it was "the contract itself that provides . . . protections" from safety and security issues, the VDOC representative responded that that was correct. She explained

19

that having "a financial contract" with a vendor creates an "expectation . . . that the service will definitely be provided or the contract will cease."

The VDOC offered no evidence that entering into a contract with an Islamic vendor would thwart the VDOC's goals. In fact, the VDOC representative testified that entering into such a contract was "possible." The only hesitation she expressed was that, if the VDOC were to enter into a contract with an Islamic vendor, it "would [also] have to do it for" other faith groups. Of course, that does not provide the VDOC an excuse to violate RLUIPA. The Supreme Court rejected that precise argument in *Holt v. Hobbs*, describing the argument as "but another formulation of the 'classic rejoinder of bureaucrats throughout history: If I make an exception for you, I'll have to make one for everybody, so no exceptions.'" 574 U.S. at 368 (quoting *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006)). I would not ignore the Supreme Court's reasoning here.[*]

III.

A prison's interest in "security deserves 'particular sensitivity.'" *Lovelace v. Lee*, 472 F.3d 174, 190 (4th Cir. 2006) (quoting *Cutter v. Wilkinson*, 544 U.S. 709, 722 (2005)). But we cannot simply "rubber stamp or mechanically accept the judgments of prison administrators." *Id.* And we must construe RLUIPA "in favor of a broad protection of

---

[*] I also note that the fear that vindication of Faver's RLUIPA rights would result in a cascade of new vendors seems unlikely given the nature of Faver's two-prong sincerely held beliefs. Faver has a sincerely held belief not only of a need for prayer oils but also that those oils cannot be obtained from a vendor that also sells pork or non-Islamic religious items.

20

religious exercise, to the maximum extent permitted by [the statute] and the Constitution." § 2000cc-3(g). Here, the VDOC has failed to demonstrate that it considered and rejected a less restrictive alternative to its single-vendor policy. For this reason, I respectfully dissent.